## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

| | | |
|---|---|---|
| PORTIA MCCOLLUM, Derivatively on Behalf of Nominal Defendant FIDELITY NATIONAL INFORMATION SERVICES INC., | ) ) ) ) | Case No. _____ |
| | ) | |
| Plaintiff, | ) | JURY TRIAL DEMANDED |
| | ) | |
| v. | ) ) | |
| GARY A. NORCROSS, STEPHANIE FERRIS, JAMES WOODALL, LEE ADREAN, ELLEN R. ALEMANY, MARK BENJAMIN, VIJAY D'SILVA, JEFFREY A. GOLDSTEIN, LISA A. HOOK, KENNETH LAMNECK, GARY L. LAUER, LOUISE M. PARENT, BRIAN T. SHEA, JAMES B. STALLINGS, JR., JEFFREY E. STIEFLER, KEITH W. HUGHES, MARK J. HAWKINS, and MARK A. ERNST | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| FIDELITY NATIONAL INFORMATION SERVICES INC., | ) ) | |
| Nominal Defendant. | | |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Portia McCollum ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint for the benefit of nominal

defendant Fidelity National Information Services Inc. ("Fidelity National" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breaches of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Fidelity National, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of Fidelity National against certain officers and members of the Company's Board for breaches of their fiduciary duties between at least May 7, 2020 and February 10, 2023, inclusive (the "Relevant Period") as set forth below.

2.      Fidelity National is a financial technology company which offers various solutions in three key segments: Merchant Solutions; Banking Solutions; and Capital Market Solutions. The Merchant Solutions segment,

which constituted roughly 30% of Fidelity National's total revenue in 2021, enables retailers to accept and process electronic payment transactions.

3.     On July 31, 2019, Fidelity National announced that it had completed the acquisition of Worldpay, Inc. ("Worldpay"), a global payment processing company, for $43 billion. After the acquisition, the Company planned to integrate Worldpay into its Merchant Solutions segment.

4.     Throughout the Relevant Period, certain of the Company's officers and directors issued materially false and misleading statements about the Worldpay acquisition, indicating that Fidelity National had "successfully completed the Worldpay integration" and touting the purported benefits of the acquisition for the Company.

5.     In reality, the Company's Merchant Solutions segment was seriously underperforming, and the Company failed to "successfully complete[]" the Worldpay integration as of the end of the Relevant Period.

6.     The truth with respect to the Company's failed integration efforts slowly emerged, beginning on August 4, 2022 with a series of key management changes. Changes in the Company's executive leadership alerted shareholders and the public that perhaps the Worldpay integration had not been progressing as seamlessly as the Individual Defendants had indicated.

7.     On November 3, 2022, the Company announced disappointing

financial results for its Merchant Solutions segment, reporting a "margin contraction of 430 basis points."

8.     Finally, on February 13, 2023, the Company announced that it was divesting itself of its Merchant Solutions business and Worldpay. The Company further reported that it had recognized a staggering $17 billion write-off of that asset.

9.     In response to these announcements, the Company's stock price declined dramatically, closing at $66.00 per share on February 13, 2023, down more than 36% from the stock's closing price of $104.13 per share on August 3, 2022, just before the Company began reporting its leadership changes.

10.     As a result of the foregoing, a securities class action was filed against the Company and Defendants Gary Norcross, Stephanie Ferris, and James Woodall, captioned *In Re Fidelity National Information Services, Inc. Sec. Litig.*, Case No. 3:23-cv-00252-TJC-PDB (M.D. Fla.) (the "Securities Action"). The Securities Action has exposed the Company to massive class-wide liability as well as defense costs.

11.     On September 22, 2023, defendants in the Securities Class Action filed a motion to dismiss the action. On September 30, 2024, this Court denied that motion, holding, in part, that:

[The plaintiffs] set forth detailed, particularized allegations

giving rise to the reasonable inference that Fidelity's acquisition of Worldpay was unsuccessful and costly, Fidelity was not achieving significant cross-sales with Worldpay, Fidelity improperly defined revenue synergies to bolster the numbers, Worldpay was losing substantial numbers of customers to competitors and thus losing market share, Fidelity's goodwill was clearly impaired and yet leaders refused to perform impairment tests at various times, Fidelity's executives knew how poorly Worldpay was doing, and—most crucially—Fidelity's executives lied to investors about all of this for years.

*See* Order, dated September 30, 2024, at 10 (23-cv-00252, ECF No. 60).

12.    The Company has sustained substantial losses as a result of the wrongful conduct detailed herein, including, but not limited to, costs to defend itself in the Securities Class Action and potentially massive class-wide liability in connection with the Securities Class Action.

13.    In addition to the costs and expenses related to the Securities Class Action, Fidelity National will incur costs related to remedying the Company's deficient internal controls over financial reporting. The misconduct detailed herein has, therefore, caused Fidelity National to waste corporate assets and has enabled certain of the Company's officers and directors who were improperly overcompensated by the Company to unjustly enrich themselves.

## **JURISDICTION AND VENUE**

14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange

Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9) and Section 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

15.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

17.    In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

18.    Venue is proper in this District pursuant to Section 27(a) of the Securities Exchange Act and 28 U.S.C. §1391(b)(1), as Fidelity National is headquartered in this Judicial District and a substantial portion of the acts and omissions alleged herein, including the dissemination of materially false and misleading information, occurred in this Judicial District.

## PARTIES

19.    Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Fidelity National common stock.

20.    Nominal Defendant Fidelity National is a Georgia corporation and maintains its principal executive offices at 601 Riverside Avenue, Jacksonville, Florida 32202. Fidelity National's common stock is traded on the NYSE under the ticker symbol "FIS."

21.    Defendant Gary A. Norcross ("Norcross") became a member of the Board in 2013, Chief Executive Officer ("CEO") of the Company in 2015 and Chairman of the Board in 2018, and he served in those positions until his departure from Fidelity National in December 2022. Norcross also served as Chief Operating Officer ("COO") of the Company from 2009 to 2015 and as President of the Company from 2012 until March 2021. According to the Company's public filings, Norcross received $45,321,374 in 2022 in compensation from the Company.

22.    Defendant Stephanie Ferris ("Ferris") has served as a member of the Board of the Company since October 2022, as President of the Company since February 2022 and as CEO of the Company since December 2022. Ferris served as Chief Financial Officer ("CFO") of Worldpay until Fidelity National's acquisition of Worldpay in July 2019. According to the Company's

public filings, Ferris received $15,830,864 in 2022 in compensation from the Company.

23.     Defendant Jeffrey A. Goldstein ("Goldstein") has served as a member of the Board of the Company since 2020 and as Chairman of the Board since December 2022. Goldstein serves as a member of the Compensation Committee and the Corporate Governance, Nominating and Sustainability Committee. Goldstein served as a member of the Audit Committee of the Board throughout 2021. According to the Company's public filings, Goldstein received $376,241 in 2022 in compensation from the Company.

24.     Defendant Lee Adrean ("Adrean") has served as a member of the Board of the Company since January 2023 and serves as Chair of the Audit Committee. Adrean also served as a member of the Board of the Company from July 2019 until May 2021.

25.     Defendant Mark Benjamin ("Benjamin") has served as member of the Board of the Company since January 2023 and serves as a member of the Compensation Committee.

26.     Defendant Kenneth T. Lamneck ("Lamneck") has served as a member of the Board of the Company since March 2022 and serves as a member of the Audit Committee and the Compensation Committee.

27.    Defendant Lisa A. Hook ("Hook") has served as a member of the Board of the Company since 2019 and serves as a member of the Audit Committee. According to the Company's public filings, Hook received $399,991 in 2022 in compensation from the Company.

28.    Defendant Gary L. Lauer ("Lauer") has served as a member of the Board of the Company since 2019 and serves as Chair of the Compensation Committee and as a member of the Corporate Governance, Nominating and Sustainability Committee. According to the Company's public filings, Lauer received $369,158 in 2022 in compensation from the Company.

29.    Defendant James B. Stallings, Jr. ("Stallings") has served as a member of the Board of the Company since 2013 and serves as a member of the Compensation Committee. According to the Company's public filings, Stallings received $361,659 in 2022 in compensation from the Company.

30.    Defendant Ellen R. Alemany ("Alemany") served as a member of the Board of the Company from 2014 until June 2024. According to the Company's public filings, Alemany received $394,620 in 2022 in compensation from the Company.

31.    Defendant Vijay D'Silva ("D'Silva") served as a member of the Board of the Company from March 2022 until June 2024.

32.     Defendant Louise M. Parent ("Parent") served as a member of the Board of the Company from 2017 until June 2024. According to the Company's public filings, Parent received $391,287 in 2022 in compensation from the Company.

33.     Defendant Brian T. Shea ("Shea") served as a member of the Board of the Company from 2018 until June 2024. According to the Company's public filings, Shea received $382,648 in 2022 in compensation from the Company.

34.     Defendant Jeffrey E. Stiefler ("Stiefler") served as a member of the Board from 2019 until May 2023. According to the Company's public filings, Stiefler received $424,212 in 2022 in compensation from the Company.

35.     Defendant Keith W. Hughes ("Hughes") served as a member of the Board of the Company from 2002 until January 2023. According to the Company's public filings, Hughes received $377,734 in 2022 in compensation from the Company.

36.     Defendant Mark J. Hawkins ("Hawkins") served as a member of the Board of the Company from June 2021 until his resignation in August 2021 due to a conflict of interest in connection with his membership on the Board of Directors of another company.

37.    Defendant Mark A. Ernst ("Ernst") served as a member of the Board of the Company from December 2022 until his resignation in January 2023 due to a preexisting non-competition agreement between him and his former employer.

**Officer Defendant**

38.    Defendant James W. Woodall ("Woodall") served as Fidelity National's Chief Financial Officer ("CFO") between 2013 and August, 2022. Prior to that, Defendant Woodall served as senior vice president, Chief Accounting Officer, and controller between 2008 and 2013. According to the Company's public filings, Defendant Woodall received $9,368,968 in 2021 in compensation from the Company.

39.    The defendants identified in ¶¶ 21-38 above are collectively referred to herein as the "Individual Defendants."

**Non-Party Confidential Witnesses**

40.    This action is based on Plaintiff's review, by counsel, of an extensive record of public documents as well as the Amended Class Action Complaint (the "Amended Complaint") in the Securities Class Action ("Securities Class Action Complaint") which contains detailed allegations based on interviews with eleven former employees of Fidelity National or Worldpay (referred to herein as FEs 1-11) who provided information to plaintiffs' counsel in the Securities Class Action supporting the allegations in

that case. These former employees provided information on a confidential basis and were described in the Amended Complaint with sufficient detail to establish their reliability and personal knowledge.

41.   FE 1 served as Vice President of Sales at Fidelity National throughout the Relevant Period.

42.   FE 2 began working at Worldpay in October 2021 as a Strategic Sales Director, Financial Services. FE 2 indicated that the Strategic Sales Team did not coordinate with Fidelity National, and the two entities were not focused on cross-selling.

43.   FE 3 served as an Enterprise Sales Executive at Fidelity National from prior to the Relevant Period until January 2023.

44.   FE 4 served as a Lead Finance Partner at Worldpay throughout the Relevant Period. In this role, FE 4 was responsible for tracking revenue synergies for Worldpay's UK small-to-medium sized business ("SMB") segment.

45.   FE 5 served as a Director, Product at Worldpay from prior to the Relevant Period until November 2021.

46.   FE 6 worked in payment solutions at Worldpay from prior to the Relevant Period until January 2021.

47.     FE 7 worked as an eCommerce, Global Strategic Account Director at Worldpay from prior to the Relevant Period until December 2021. In this role, FE 7 managed Worldpay's six largest eCommerce accounts.

48.     FE 8 served as a Senior Sales Executive, Managed Risk Services at Fidelity National from prior to the Worldpay acquisition until August 2021.

49.     FE 9 served as a Senior Vice President, GM Commercial Digital Payments from prior to the Relevant Period until the second quarter of 2021. FE 9 was responsible for generating revenue synergies between Fidelity National and Worldpay, but FE 9 described the revenue targets as "so egregious" and highly unrealistic.

50.     FE 10 served as a Senior Vice President, Product Management at Worldpay from prior to the Relevant Period until January 2021.

51.     FE 11 worked as a Finance Business Partner for Fidelity National from January 2022 until the end of the Relevant Period. FE 11 was responsible for generating forecasts and budgets for Worldpay and for monitoring revenue synergies for an omni commerce business solutions initiative between Fidelity National and Worldpay during 2022.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

52.     By reason of their positions as officers and/or directors of Fidelity National, and because of their ability to control the business and corporate

affairs of Fidelity National, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Fidelity National in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Fidelity National and its shareholders.

53.    Each director and officer of the Company owes to Fidelity National and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

54.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Fidelity National, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

55.    Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a

knowing and culpable violation of their obligations as directors and/or officers of Fidelity National, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

56.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

57.    To discharge their duties, the officers and directors of Fidelity National were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.

By virtue of such duties, the officers and directors of Fidelity National were required to, among other things:

      (i)    Ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Georgia and the United States, and pursuant to Fidelity National's own Code of Conduct and Business Ethics;

      (ii)    Conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

      (iii)    Remain informed as to how Fidelity National conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

      (iv)    Establish and maintain systematic and accurate records and reports of the business and internal affairs of Fidelity National and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

      (v)    Maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that

Fidelity National's operations would comply with all applicable laws and Fidelity National's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(vi)    Exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and

(vii)    Examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

58.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Fidelity National and were at all times acting within the course and scope of such agency.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

59.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual

Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

60.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

61.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

62.     In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors or officers of Fidelity National, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

63.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or

constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

64.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Fidelity National and at all times acted within the course and scope of such agency.

## FIDELITY NATIONAL'S CODE OF BUSINESS CONDUCT AND ETHICS

65.    Fidelity National's Code of Business Conduct and Ethics (the "Code of Conduct") begins with a message from Defendant Ferris, stating, in relevant part:

> FIS is a global organization with locations and business partners all over the world. Our company was founded on the belief that doing the right thing builds a foundation for our long-term success. As we continue to grow, one thing that will never change is our belief that maintaining our good reputation depends on each of us being personally responsible for our actions.
>
> Each of us will face tough decisions and ethical dilemmas during our careers. When faced with different choices, it is not always easy to make the ethical decision. While achieving great results is important, it is even more important to focus on how we achieve them. The decisions you make each day have an impact on our core values – **Lead with Integrity, Be the Change** and **Win as One Team**.
>
> At FIS, we are on a relentless pursuit of client excellence to go above and beyond our clients' expectations. As an integral part of this pursuit, ethical business practices and behaviors are a top

priority, at the core of everything we do, and woven into our daily operations.

Our behavior impacts the company's reputation with clients and shareholders, dealings with suppliers, communications with regulatory agencies and interactions with others in the workplace. We believe the quality of our people is our greatest asset, differentiating us and personifying our leadership position within the industry. You play a critical role in upholding FIS' reputation for ethical business practices and performance for client excellence.

66.     In a subsection titled "Lead With Integrity," the Code of Conduct

states, in relevant part, "We have the courage to be open and transparent—to

build trust."

67.     In a section titled "Compliance with Laws," the Code of Conduct

states that "Colleagues are **REQUIRED** to comply not only with the Code

and Company Policies but also with applicable laws, rules, and regulations in

connection with their employment or service with the Company."

68.     With respect to financial reporting, the Code of Conduct states, in

relevant part:

The Company has established policies and internal controls designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements. Internal controls are intended to ensure the following:

- Full and accurate records of dispositions of Company assets are maintained;
- Transactions are recorded as necessary to prepare accurate financial statements;

20

- Receipts and expenditures are made only in accordance with official authorizations; and
- Unauthorized acquisition, use or disposition of the Company's assets are prevented or detected.

69. With respect to public disclosure, the Code of Conduct stated, in relevant part:

> As a public company, the Company **MUST** provide full, fair, accurate, timely and understandable disclosure in the reports that the Company files with or submits to the SEC and its other public disclosures, including press releases. Such disclosures **MAY** include information generated by or related to the Company's subsidiaries located around the world. The Company has established disclosure controls and procedures to help ensure that information required to be disclosed by the Company in its SEC reports and other public disclosures is accumulated from appropriate information sources within the Company, and communicated to management as appropriate to allow timely decisions regarding disclosure and the completion of accurate SEC reports.

> The Company's SEC reports and other public disclosures **MUST** be free of material misstatements and misleading omissions. The Company's public financial information **SHOULD** fairly represent in all material respects the Company's financial condition, results of operations and cash flows.

## FIDELITY NATIONAL'S AUDIT COMMITTEE CHARTER

70. Fidelity National's Audit Committee Charter states that the purpose of the Audit Committee is to, among other things, "provide independent review and oversight of the Company's accounting and financial reporting processes, financial statements, internal controls over financial reporting, , [*sic*] audit processes and financial results of the Company's

operations."

71.     The Audit Committee Charter further states that:

The Committee is responsible for assisting the Board's oversight of (1) the quality and integrity of the Company's financial statements and related disclosures, (2) the Company's compliance with legal, tax and regulatory requirements, (3) the independent registered public accounting firm's qualifications and independence, and (4) the performance of the Company's internal audit function, internal controls over financial reporting, and independent registered public accounting firm.

72.     In a subsection titled "Financial Statements and Related Disclosures," the Audit Committee Charter states, in relevant part:

The Committee shall review with management and the independent registered public accounting firm the annual audited financial statements, the quarterly financial statements, and any internal control matters requiring attention, including the Company's disclosures under MD&A, before the filing of the Company's Form 10-K and Form 10-Q.

The Committee shall review with management earnings press releases before they are issued. The Committee shall review generally with management the nature of the financial information and earnings guidance provided to analysts and rating agencies.

                               ***

The Committee shall review with management, and any outside professionals as the Committee considers appropriate, the effectiveness of the Company's disclosure controls and procedures.

## SUBSTANTIVE ALLEGATIONS

### *Background of the Company*

73.    Fidelity National is a global financial technology Company, founded in 1968 as Systematics, that provides a range of products and services to financial institutions and other businesses.

74.    In 2003, the Company was acquired by Fidelity National Financial and was renamed Fidelity National Information Services.

75.    Over the next several years, in large part due to key acquisitions of other financial technology companies, Fidelity National grew into a Fortune-500 company and the largest processing and payments company in the world.

76.    The Company's key offerings are its Merchant Solutions, Banking Solutions, and Capital Market Solutions. The Merchant Solutions segment, constituting roughly 30% of the Company's total revenue in 2021, enables retailers to accept and process electronic payment transactions.

77.    On July 31, 2019 Fidelity National announced that it had acquired Worldpay, Inc. ("Worldpay"), a global payment processing company, and planned to integrate it into its Merchant Solutions segment.

78.    The Worldpay acquisition was the Company's largest acquisition to date and was valued at $48.2 billion. Fidelity National touted the acquisition as a catalyst for Company growth. Specifically, in the press

release announcing the closing of the acquisition, then-CEO Defendant Norcross stated that "the Worldpay acquisition is a demonstrable proof point in our overall growth strategy. We are confident that our focus on innovating with purpose to advance the way the world pays, banks and invests will continue to deliver long-term value to our clients and shareholders."

79. The Company attributed roughly 80% of the overall purchase price of Worldpay to "goodwill," claiming that Worldpay's $38.4 billion worth of "[g]oodwill consists primarily of expected synergies of combining operations, the acquired workforce, and growth opportunities."

80. To justify the massive premium, the Individual Defendants represented in a Joint Proxy Statement soliciting approval for the acquisition from both Fidelity National's and Worldpay's shareholders that integration of the two entities would generate at least $500 million in revenue synergies over the first three years "primarily from cross-selling to merchants and financial institutions globally."

81. Leading up to the Relevant Period, the Company assured shareholders and the public that the Worldpay integration was progressing smoothly. For example, during a February 2020 earnings call, while discussing the Company's priorities for the upcoming year, Defendant Norcross stated: "[w]e will seamlessly execute the Worldpay integration in order to achieve our revenue and cost synergy goals. *We are already well-*

*ahead of schedule* and will look to further accelerate our momentum in 2020" (emphasis added).

**The Individual Defendants Failed to Successfully Integrate Worldpay**

82.    Despite the Individual Defendants' representations to the contrary, former employees of Fidelity National and Worldpay confirm that the Worldpay acquisition failed to achieve any meaningful synergies, and the Company lost substantial customers and market share in the wake of the acquisition. Further, Worldpay lost key personnel following the acquisition.

83.    For example, FE 7, who served as an eCommerce, Global Strategic Account Director at Worldpay during the Relevant Period, was not aware of any cross sales between Fidelity National and Worldpay. Likewise, FE 4, who worked as a Lead Finance Partner at Worldpay, stated that cross sales between Fidelity National and Worldpay were virtually non-existent at Worldpay's UK SMB business. FE 2, a former Strategic Sales Director, Financial Services at Worldpay also stated that there was no integration and virtually no cross sales at all between the two entities. FE 8, a former Senior Sales Executive, Managed Risk Services at Fidelity National similarly recalled no cross sales between Fidelity National and Worldpay after the acquisition.

84.    According to FE 1, former Vice President of Sales at Fidelity National, the Company tried unsuccessfully to integrate some of Worldpay's

products. FE 5, former Director, Product at Worldpay, similarly recalled an initiative to package certain Fidelity National and Worldpay products together that failed due to a lack of adequate funding.

85.    According to FE 3, a former Enterprise Sales Executive at Fidelity National, there was at least one instance in which Fidelity National lost a customer due attempts to integrate without the necessary funding and resources. FE 3 specifically recalled losing a $6 million payment management deal with an insurance client after being forced to include Worldpay's products in the deal because Fidelity National employees working on the deal did not receive adequate training on Worldpay's products. FE 7 similarly stated that an initiative to cross-sell for a deal with Netflix failed due to an inability to integrate the two culturally distinct entities.

86.    FE 3 stated that there was no incentive for Fidelity National employees to engage in cross-selling. FE 2 recalled that, in 2020, the two entities introduced an initiative to incentivize cross sales by providing an extra commission to employees for doing so, but the initiative was dropped months later.

87.    FE 2 recalled challenges in cross selling products due to incompatible information systems at the two entities. Specifically, Fidelity National and Worldpay used different customer relationship management systems ("CRMs"), with Fidelity National using Microsoft Dynamics and

Worldpay using Salesforce. FE 2 and FE 3 stated that it was difficult to access accurate customer data from the other entity which rendered cross selling infeasible.

88.     FE 2 further explained that the Company lost customers who expected Fidelity National and Worldpay to be fully integrated after the acquisition and opted to transact with competitors rather than enter into separate agreements with Fidelity National and Worldpay.

89.     FE 8 similarly recalled difficulties associated with Fidelity National and Worldpay using separate contracts and using different processes for pricing and quotes which made it challenging for the two entities to provide quotes to each other's clients.

90.     Despite the Company's failure to achieve revenue synergies between Worldpay and Fidelity National, the Individual Defendants obscured this reality by misleadingly reporting any new business acquired after the acquisition as part of its calculation of revenue synergies, rather than only including additional revenue that was specifically attributable to combining operations. As a result, the Company's reported revenue synergies were materially overstated throughout the Relevant Period.

91.     In addition to the lack of revenue synergies between the two entities, Worldpay lost substantial customers and market share following the acquisition. FE 7 confirmed that, after the acquisition, many of Worldpay's

customers left to its competitors like Adyen, Stripe, Pay.com, and Checkout.com. FE 7 specifically recalled Worldpay losing Sony, its second largest eCommerce customer, in November 2020 to Adyen. FE 7 stated that Worldpay further lost Netflix's business in both Australia and Canada.

92.    FE 4 similarly recalled Worldpay's UK SMB business losing customers rapidly to competitors including Square and Stripe. FE 4 stated that Worldpay's U.S. SMB faced similar issues. Indeed, Worldpay's SMB business experienced negative customer growth throughout the Relevant Period. FE 11, a former Finance Business Partner for Fidelity National, also recalled negative customer growth while working at the Company. FE 2 specifically recalled Worldpay losing customers to JPMorgan Chase while working at Worldpay.

93.    FE 6, who worked in payment solutions at Worldpay, stated that Worldpay was unable to keep up with its competitors because Fidelity National failed to adequately invest in product innovation at Worldpay.

94.    FE 5, a former Director, Product, at Worldpay, stated that Worldpay lacked the flexibility and agility needed to introduce new products to market because new products needed to undergo an inefficient approval process at Fidelity National.

95.    According to former employees, the integration issues were exacerbated by the Company's failure to retain key Worldpay personnel

following the acquisition. For instance, according to FE 10, former Senior Vice President, Product Management at Worldpay, Worldpay's former EVP, Head of Global eCommerce, Shane Happach ("Happach"), was pushed out of the Company shortly after the acquisition. Happach was responsible for overseeing the growth of Worldpay's Global eCommerce business from $80 million to over $1 billion over the course of his ten-year tenure at Worldpay, and when he left the Company, he took his relationships with Worldpay's biggest customers with him.

96.     FE 7 recalled Worldpay losing roughly 50 percent of its senior engineers in late 2021 and early 2022. FE 6 stated that senior Worldpay personnel were replaced by affiliates of Fidelity National leadership who lacked experience with Worldpay's merchant and global payment products shortly after the acquisition.

***In Violation of Generally Accepted Accounting Principles, the Individual Defendants Failed to Record a Goodwill Impairment Charge in Connection with Worldpay in 2021 and 2022***

97.     In light of Worldpay's downward trajectory following the acquisition, the Individual Defendants were required to reevaluate Worldpay's goodwill in accordance with generally accepted accounting principles ("GAAP"). As a result of the Individual Defendants' failure to do so during the second and third quarters of 2021 and throughout 2022, the

Company's quarterly and annual reports materially overstated Fidelity National's goodwill and total assets.

98.    Public companies like Fidelity National are required to evaluate goodwill for impairment at least once a year. However, pursuant to GAAP, Fidelity National is also required to conduct interim goodwill impairment testing if there exist certain red flags that indicate that the value of an asset has declined. The Individual Defendants acknowledged this requirement in the Company's annual filed on Form 10-K with the SEC on February 23, 2022 (the "2021 10-K"), stating that "[t]he Company assesses goodwill for impairment by reporting unit on an annual basis during the fourth quarter *or more frequently if circumstances indicate potential impairment*."

99.    Pursuant to Accounting Standards Codification ("ASC") 350-20-35-3c, examples of some red flags include, *inter alia*, "macroeconomic conditions such as deterioration in general economic conditions," "industry and market considerations such as a deterioration in the environment in which an entity operates," and "*overall financial performance* such as negative of declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods."

100.  Here, the Individual Defendants received several red flags indicating that the value of Worldpay had diminished. Specifically, Worldpay

had lost substantial customers and market share, including, Sony, its second largest eCommerce client, as well as key senior personnel. Worldpay lost Sony as a customer in November 2020. Accordingly, by the third quarter of 2021, Worldpay had experienced at least nine months of decreased cash flows resulting from lost sales from its second largest eCommerce client. Further, the Company's share price and market capitalization had declined substantially by the third quarter of 2021. Thus, by the third fiscal quarter of 2021 at the latest, the Individual Defendants were obligated to reevaluate Worldpay's goodwill for impairment.

***Defendants' Materially False and Misleading Statements***

101.   On May 7, 2020, the Company filed a quarterly report for its first fiscal quarter of 2020 on Form 10-Q with the SEC (the "1Q20 10-Q"), which stated that, "[a]s of the end of the first quarter of 2020, our achievement of expense and revenue synergies is ahead of schedule."

102.   In a press release, issued by Fidelity National on the same day, the Individual Defendants claimed that the Company had already achieved "[r]evenue synergies of approximately $100 million, an increase of $20 million compared to the fourth quarter of 2019" and affirmed the Company's "previously-announced revenue synergy targets . . . [of] $200 million exiting 2020 . . . [and] $550 million exiting 2022."

103.   On August 4, 2020, during an earnings call hosted by the Company to discuss its second quarter 2020 financial results, Defendant Norcross represented that the Company was "ahead of schedule to meet [its] aggressive three-year synergy targets":

> ***We continue to outpace expectations on our synergy goals and are well ahead of schedule to meet our aggressive three-year synergy targets. At the end of the quarter, our teams have achieved more than . . . $115 million in annual revenue synergies.*** We have an additional $60 million in revenue synergies that we are in the process of implementing now and we have a growing pipeline of cross-sell opportunities that will continue to drive additional growth. Our ability to exceed our synergy goals so early is a testament to the value our colleagues are creating by winning as one team. [Emphasis added].

104.   On October 29, 2020, during an earnings call hosted by the Company to discuss its third quarter 2020 financial results, Defendant Woodall claimed that the Worldpay integration was "ahead of schedule" and touted the revenue synergies between Worldpay and Fidelity National:

> Touching on our Worldpay integration we are more than two years ahead of schedule. We have achieved $150 million in revenue synergies as we continue to see really strong traction with our premium payback solution and we are significantly outperforming our initial expectations for merchant bank referrals.

105.   On February 9, 2021, the Company held an earnings call after announcing its fourth quarter and full year 2020 financial results. During the

call, Defendant Norcross overstated the Company's progress with the Worldpay integration, stating:

> [Fidelity National] made great progress with the Worldpay integration, remaining well ahead of plan and exited the year generating more than $200 million in revenue synergies and more than $750 million in cost synergies. With this impressive momentum, we are excited to build on our strengths as we look ahead to accelerating organic revenue growth in 2021.

106.   On February 18, 2021, Fidelity National filed an annual report on Form 10-K with the SEC (the "2020 10-K"), signed by Defendants Norcross, Adrean, Alemany, Goldstein, Hook, Hughes, Lauer, Parent, Shea, Stallings, and Stiefler. With respect to the Worldpay integration, the 2020 10-K stated:

> As of the end of 2020, our achievement of revenue synergies remains on track to meet or exceed our current targets driven by successful cross-sell of our heritage Premium Payback solution into heritage Worldpay clients and by leveraging our heritage Worldpay sales and distribution teams, expanding on our existing relationships with financial institutions to establish merchant referral agreements and optimizing our network routing capabilities.

107.   On March 22, 2021, at the Bank of America Securities Electronic Payment Virtual Symposium, Defendant Norcross highlighted the benefits to the Company of having completed the Worldpay integration, stating, "our cross-sell wins have been very strong coming out of the Worldpay integration . . . the fundamentals of putting the 2 companies together really has exceeded our expectations at this point. We're well ahead of process." At that same

conference, Norcross further claimed that after having incorporated Worldpay, the Company's Merchant Solutions segment "long term could be a double[-]digit grower," despite the fact that Worldpay had historically experienced only single-digit revenue growth.

108.  On May 6, 2021, during the Company's first quarter 2021 earnings call, Defendant Norcross indicated that "synergies with the Worldpay integration" had made a "significant contribution" to Fidelity National's increased financial guidance. A press release, issued by the Company on the same day, stated that "[t]he Company achieved annual run-rate synergies related to the Worldpay acquisition, exiting the first quarter 2021" with "*[r]evenue synergies of approximately $300 million on an annual run-rate basis, including ongoing execution of cross-sell opportunities*, bank referral agreements, geographic expansion, ramping volumes and Merchant SMB sales initiatives."

109.  On June 10, 2021, at the Baird Global Consumer, Technology & Services Conference, Defendant Norcross stated the following regarding the Worldpay integration:

> We couldn't be more pleased with it. I hate to say it this way, but we really haven't had negative surprises with Worldpay. We typically do – as you go through due diligence, especially as you're starting to dig in on your revenue synergies and where you're going to see opportunities come with cross-sell and upsells to our base. But frankly, everything [ha]s . . . hit as we expected, and many reasons and many examples have exceeded our expectations. And frankly, that's why you saw

Woody and I both raise our overall revenue synergy guidance coming out of last quarter.

110. On August 3, 2021, during the Company's second quarter 2021 earnings call, Defendant Norcross told analysts that "you're seeing us exceed our cross-sales and revenue synergies with the Worldpay integration." Defendant Norcross further partially attributed the Company's "record quarter from a sales perspective" to "revenue synergies across the Worldpay integration efforts." A press release, issued by the Company on the same day, reported that Fidelity National was "rais[ing] year-end 2021 revenue synergy target by $100 million to approximately $700 million on an annual run-rate basis, in order to reflect strong cross-selling performance during the second quarter."

111. On November 4, 2021, Fidelity National filed a quarterly report on Form 10-Q with the SEC for its third fiscal quarter of 2021 (the "3Q21 10-Q"), which reported $161 million in net earnings for the quarter and $52.8 billion in goodwill as an asset on the Company's balance sheet as of September 30, 2021, including $35.9 billion in goodwill attributable to Worldpay.

112. The 3Q21 10-Q further indicated that goodwill was not impaired:

Due to the continued economic impact of the COVID-19 pandemic, we evaluated if events and circumstances as of September 30, 2021, indicated potential impairment of our reporting units. We performed a qualitative assessment by

examining factors most likely to affect our reporting units' fair values and considered the impact to our business from the COVID-19 pandemic. The factors examined involve significant use of management judgment and included, among others, (1) forecast revenue, growth rates, operating margins, and capital expenditures used to calculate estimated future cash flows, (2) future economic and market conditions and (3) FIS' market capitalization. Based on our interim impairment assessment as of September 30, 2021, we concluded that it remained more likely than not that the fair value continues to exceed the carrying amount for each of our reporting units; therefore, goodwill was not impaired.

113.   Also on November 4, 2021, during the Company's third quarter 2021 earnings call, Defendant Norcross stated:

Revenue synergies related to our Worldpay integration increased to $150 million in the quarter, bringing the total to $600 million on an annual run rate basis. We remain on schedule to exceed $700 million exiting this year, beating our original target by 40%, while accomplishing this feat a year early.

114.   On November 16, 2021, at the RBC Global Technology, Internet, Media and Telecom Conference, Defendant Norcross indicated that the Company had successfully completed the Worldpay integration, stating: "when you look at where we are on the Worldpay integration, we've got really Worldpay predominantly behind us now. We've got all our segments really hitting on all cylinders[.]" Also during the conference, Defendant Norcross represented that the Company was actually *gaining* market share in the Merchant Solutions segment:

And so I think what people see when they look and really dig through all of that, no way you can say that FIS is losing share,

just the exact opposite. No way to think that we can – when you look, we're actually a leader in the disruption, not going to be disrupt[ed], and that's hopefully the narrative that people are going to start realizing as they do their work.

115.  On February 15, 2022, during Fidelity National's earnings call for the fourth quarter and full year 2021, Defendant Norcross announced that the Company had "successfully completed the Worldpay integration nearly a year ahead of schedule, beating our initial revenue synergy target by 50% and more than doubling our initial expense synergy target." Norcross further highlighted that the Company's sales team "***has done an excellent job driving cross sales through the Worldpay integration and we exceeded . . . more than $700 million in cross sales***."  (Emphasis added). Norcross reiterated that Fidelity National would be able to "take advantage of a broader addressable market" as a result of "success in revenue synergies with the Worldpay integration."

116.  On February 23, 2022, Fidelity National filed its 2021 10-K, signed by Defendants Norcross, Alemany, Goldstein, Hook, Hughes, Lauer, Parent, Shea, Stallings, and Stiefler. The 2021 10-K contained substantively the same statement with respect to the Worldpay integration that was contained in the 2020 10-K and maintained that the Company's goodwill was not impaired throughout 2021.

117.   The 2021 10-K further reported $424 million in net earnings for the Company's 2021 fiscal year and $53.3 billion in goodwill as an asset on the Company's balance sheet as of September 30, 2021, including $36.4 billion in goodwill attributable to Worldpay.

118.   On March 9, 2022 at Wolfe Research's Fintech Forum, Defendant Norcross stated:

> [Fidelity National] really successfully completed the Worldpay integration. We blew out any of our operating synergies going into that, whether it was on expense takeout or revenue. Revenue exceeded well over $700 million across sales. We ended up getting over $900 million of cost takeout. So we feel great about that integration and how that went.

119.   On April 15, 2022, Fidelity National filed a proxy statement on Form DEF 14A with the SEC (the "2022 Proxy"), soliciting shareholder approval for, *inter alia*, the re-election of Defendants Alemany, D'Silva, Goldstein, Hook, Hughes, Lamneck, Lauer, Norcross, Parent, Shea, Stallings, and Stiefler to serve for another one-year term on the Company's Board and the compensation of certain of the Company's executive officers including Defendants Norcross, Ferris, and Woodall.

120.   The 2022 Proxy stated the following regarding synergies achieved by the Worldpay acquisition:

> The Worldpay Integration Incentive Plan has been highly successful in driving the attainment of revenue and cost synergies. As of December 31, 2021, we realized revenue synergies of approximately $750 million on an annual run-rate

basis and expense synergies of approximately $900 million on an annual run-rate basis.

121. With respect to the Company's internal controls over financial reporting, the 2022 Proxy stated that the Audit Committee was responsible for "[r]eviewing the quality, adequacy and effectiveness of the Company's internal controls over financial reporting and any significant deficiencies or material weaknesses in internal controls over financial reporting."

122. The statements in the 2022 Proxy were materially false and misleading because the Company's reported synergies were materially overstated. Further, despite the 2022 Proxy's descriptions of the Audit Committees' oversight responsibilities with respect to internal controls over financial reporting, the Audit Committee was not adequately fulfilling these responsibilities and was causing or permitting the Company to issue false and misleading statements.

123. On May 3, 2022, Fidelity National filed a quarterly report on Form 10-Q with the SEC for its first fiscal quarter of 2022 (the "1Q22 10-Q") which reported $121 million in net earnings for the quarter and $53 billion in goodwill as an asset on the Company's balance sheet as of September 30, 2021, including $36.1 billion in goodwill attributable to Worldpay. The 1Q22 10-Q reiterated that, as of March 31, 2022, the Company's goodwill was not impaired.

124.  The statements identified above in ¶¶ 101 through 123 were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the Worldpay integration was not ahead of schedule; (ii) the Company failed to successfully integrate Worldpay throughout the Relevant Period; (iii) the Individual Defendants were manipulating the Company's revenue synergy calculations by attributed any new business after the acquisition to the integration; (iv) as a result, the Company's reported revenue synergies were materially overstated throughout the Relevant Period; (v) Worldpay lost substantial customers and market share following the acquisition; (vi) Worldpay lost key senior personnel following the acquisition; (vii) as a result of the foregoing, the Company's financial results were materially overstated and positive statements concerning the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis at all relevant times.

### *The Truth Gradually Emerges*

125.  On August 4, 2022, the Company announced financial results for its second fiscal quarter of 2022, revealing that adjusted EBITDA margins in the Merchant Solutions segment contracted by 280 basis points to 47%. During an earnings call, hosted by the Company on the same day, an analyst probed the Individual Defendants regarding the Company's decision to omit

certain key performance indicators related to its Merchant Solutions segment, including U.S. and global volumes and transaction growth, from its earnings report, despite providing that information to investors in the three previous fiscal quarters. In response, Defendant Woodall conceded that the Company "saw sequential volume decreases" during the quarter.

126.   Also on August 4, 2022, the Company announced the resignation of Defendant Woodall.

127.   On this news, the price of Fidelity National stock declined more than 7% in one day, from a closing price of $104.13 per share on August 3, 2022 to a closing price of $96.57 per share on August 4, 2022.

128.   Despite these disclosures, the price of Fidelity National stock remained artificially inflated as the Individual Defendants continued to issue materially false and misleading statements. For instance, in the Company's quarterly report for its second fiscal quarter of 2022, filed on Form 10-Q with the SEC on August 4, 2022, the Individual Defendants maintained that, as of June 30, 2022, the Company's goodwill was not impaired. Further, during the Company's second quarter 2022 earnings call on the same day, Defendant Ferris maintained that Fidelity National has been "hugely successful in terms of driving revenue synergies on the Worldpay transaction."

129.   The Company continued to undergo management changes. On October 18, 2022, Fidelity National issued a press release announcing that

Defendant Ferris, who had been appointed President in February 2022, would replace Defendant Norcross as the new CEO effective January 1, 2023. Defendant Norcross, who had served as CEO since 2015, would become Executive Chairman of the Board.

130. The Company's carefully crafted narrative with respect to the Worldpay integration unraveled further on November 3, 2022, when Fidelity National announced disappointing financial results during its third quarter 2022 earnings call (the "November 3, 2022 earnings call"), specifically highlighting the Company's struggling Merchant Solutions segment. During that call, Defendant Norcross reported that profit margins in the Merchant Solutions segment "saw a continued pressure in the quarter," which "resulted in an overall adjusted EBITDA margin contracting by 150 basis points year-on-year." Norcross explained, "we are not pleased with the profitability performance of the business and are taking actions to address them." Further, on the same call, the Company's new CFO, Eric Hoag, specifically highlighted the 430 basis-point margin contraction in the Merchant Solutions segment during the quarter. Despite the evident problems with the Merchant Solutions segment, in response to a question about the Company's other cross-selling projects, Norcross stated that Fidelity National has been "simply taking the success that we had with the Worldpay integration of cross-sales and amplifying that up to the next level."

131.   During that same earnings call, David Koning, a Baird analyst, encapsulated the Company's disappointing financial results, bluntly stating: "on margins . . . if we look first just at Merchant, it was close to 100% incremental margin in both 2020 and 2021. And now this year it's closer to zero."

132.   After the November 3, 2022 earnings call, analysts from Raymond James reported "a disastrous 3Q print that we can only hope was the kitchen sink and then some." Raymond James analysts further stated that they were "particularly disappointed by merchant growth." Analysts at UBS reported that Fidelity National's "results missed our and Street expectations driven by underperformance from Merchant Solutions," noting that "[w]hile we were expecting some form of medium-term guidance reset, we were still anticipating to hear about a path back to high-single digits for Merchant Solutions, which did not occur, leading some investors to wonder if there may be structural problems."

133.   On this news, the Company's stock price declined $22.29 per share, or more than 28%, closing at $57.18 per share on November 3, 2022.

134.   On December 15, 2022, the Company announced that it was conducting a "comprehensive assessment of the Company's strategy, business, operations and structure" with a "focus on identifying and optimizing incremental revenue generation, margin improvement and cost

reduction opportunities." The Company further reported that then-CEO, Defendant Norcross, would be stepping down as CEO and as a Board member earlier than anticipated. Norcross would resign as CEO effective December 16, 2022, rather than the previously announced date of January 1, 2023, and he would no longer be appointed Executive Chairman of the Board as the Company had indicated earlier.

135.  The truth finally fully emerged on February 13, 2023, when the Company filed a Current Report on Form 8-K with the SEC, announcing its fourth quarter and full year 2022 financial results. That filing included a press release announcing that the Company would be getting rid of its Merchant Solutions business and Worldpay and "recorded a non-cash goodwill impairment charge of $17.6 billion related to Merchant Solutions reporting unit in the quarter." This staggering write-off constituted more than 40 percent of the Company's acquisition price for Worldpay just a few years earlier.

136.  In the wake of this news, analysts from Mizuho characterized the Worldpay acquisition as "a huge failure," stating that the Company's merchant business has "deteriorated considerably since the merger." Additionally, analysts from Morningstar attributed the massive write-off to the Company's poor execution of the Worldpay integration, explaining that "recent issues stem more form operational missteps and that the strategy

behind the combination was not necessarily flawed from a long-term perspective." Wells Fargo issued a report titled "FIS: The Struggle is Real," which further highlighted the enormous, $17.6 billion impairment charge. Argus Research reported that "the unwinding of the large Worldpay acquisition is a black eye on the company's former strategy."

137.   On this news, the price of Fidelity National stock declined another $9.43 per share, or more than 12%, from its price on the prior trading day of February 10, 2023, closing at $66.00 per share on February 13, 2023.

### Stock Repurchases During the Relevant Period

138.   On February 1, 2021, the Company announced a share repurchase program pursuant to which it authorized Fidelity National to repurchase up to 100 million shares of the Company's Class A common stock.

139.   The closing price of Fidelity National common stock on February 1, 2021 was $129.23 per share, almost double the $66.00 per share closing price of Fidelity National common stock after the corrective disclosures on February 13, 2023. Accordingly, the Company has been damaged to the extent that it repurchased Fidelity National stock during the Relevant Period at prices artificially inflated by the materially false and misleading statements detailed herein.

## DERIVATIVE AND DEMAND REFUSED ALLEGATIONS

140.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

141.   Fidelity National is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

142.   Plaintiff is a current shareholder of Fidelity National and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

143.   At the time this action was commenced, the eight-member Board was comprised of Individual Defendants Adrean, Benjamin, Ferris, Goldstein, Hook, Lamneck, Lauer, and Stallings.

144.   The Individual Defendants ether knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

145. The Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein.

146. Additionally, the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

147. Moreover, the Individual Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

148. Nevertheless, by letter dated June 30, 2023, Plaintiff made a demand on the Board to investigate and remedy the violations of law described therein (the "Litigation Demand"). *See* Exhibit A.

149. In the Litigation Demand, Plaintiff demanded as follows:

Ms. McCollum hereby demands that the Board take "suitable action" pursuant to GA Code § 14-2-742. Specifically, Ms. McCollum demands that the Board initiate and complete an investigation into the violations of federal law and breached of fiduciary duties under Georgia law, waste of corporate assets, unjust enrichment, and violations of all other state laws, regulations, and rules by members of the Board and Fidelity National's directors, executives and employees regarding the Company's acquisition and integration of Worldpay into its Merchant Solutions segment. Such investigation must cover not only the facts cited herein but any other credible indication of

misconduct by the Board and Fidelity National's executives and employees concerning the acquisition and integration of Worldpay. This investigation must be conducted by independent and disinterested Board members with the assistance of independent outside legal counsel  and other advisors, as needed.

Ms. McCollum demands that the Company commence legal proceedings against each party identified as being responsible for the misconduct identified by the independent investigation. Such legal proceedings must seek to have each wrongdoer jointly and severally reimburse the Company for the harm they have caused Fidelity National. The legal proceedings shall also seek to recover the salaries, bonuses, director remuneration, and other compensation paid to the responsible individuals. All such litigation must be timely commenced and within applicable statutes of limitations.

The above-described events also demonstrate the need for significant corporate governance and operational policy changes to ensure compliance with applicable laws and regulations. These reforms should address not only the Company's public disclosures, but also compliance with laws and regulations generally applicable to companies like Fidelity National, such as the securities laws.

150.   The Litigation Demand outlined alleged misstatements issued by "certain of Fidelity National's current and former directors and officers" related to "the Company's acquisition and integration of Worldpay, Inc. ('Worldpay') into Fidelity National's Merchant Solutions segment."

151.   On August 25, 2023, Fidelity National established a Demand Review Committee ("DRC") to address the allegations detailed in the Litigation Demand.

152. On October 25, 2023, counsel for the DRC informed Plaintiff that it was in "the Company's best interest that the investigation into the [Litigation Demand] be temporarily paused in light of the related securities class action."

153. The Securities Class Action has since progressed, and on September 30, 2024, this Court denied a motion to dismiss the Securities Class Action filed by the defendants in that case.

154. The Board's failure to follow up with the investigation into the allegations detailed in the Litigation Demand for a full year constitutes a wrongful refusal of the Litigation Demand, is unreasonable and improper, and demonstrates the Board's lack of good faith.

155. Accordingly, refusal of the Litigation Demand is not a valid exercise of business judgment and, therefore, Plaintiff is permitted to proceed and to prosecute this action derivatively on behalf of the Company.

## COUNT I

### Against the Individual Defendants for Violations of § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a) and Rule 14a-9 (17 C.F.R.§240.14a-9)

156. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

157.   The Individual Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

158.   The Individual Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2022 Proxy filed with the SEC. As alleged above, this filing contained materially false and misleading statements concerning the Worldpay integration and the Company's internal controls over financial reporting.

159.   The 2022 Proxy was used to solicit shareholder votes in connection with the election of Defendants Alemany, D'Silva, Goldstein, Hook, Hughes, Lamneck, Lauer, Norcross, Parent, Shea, Stallings, and Stiefler to serve for another one-year term on the Company's Board and the compensation of certain of the Company's executive officers including Defendants Norcross, Ferris, and Woodall.

160.   Describing the Company's compensation policy, the 2022 Proxy indicated that the compensation is performance-based, stating that "[o]ur compensation programs are grounded on the concept of paying for performance and intended to foster a high-performance culture."

161.   The materially false and misleading statements contained in the 2022 Proxy regarding the Worldpay integration and the adequacy of the

Company's internal controls over financial reporting therefore misleadingly induced shareholders to vote in favor of the election of Defendants Alemany, D'Silva, Goldstein, Hook, Hughes, Lamneck, Lauer, Norcross, Parent, Shea, Stallings, and Stiefler and performance-based compensation to Defendants Norcross, Ferris, and Woodall, to which they were not entitled.

162.   The payment of unwarranted performance-based compensation to these Company executives was a waste of corporate assets.

## COUNT II

### Against the Individual Defendants for Violations of § 10(b) of the Exchange Act, 15 U.S.C. § 78(j), and Rule 10b-5, 17 C.F.R. § 240.10b-5

163.   Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

164.   The Individual Defendants participated in a scheme with the purpose and effect of defrauding Fidelity National. Not only is Fidelity National now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Fidelity National by the Individual Defendants.

165.   On February 1, 2021, the Company announced a share repurchase program pursuant to which it authorized Fidelity National to repurchase up to 100 million shares of the Company's Class A common stock

while the price of Company stock was artificially inflated due to the materially false and misleading statements and material omissions described above.

166. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements, and periodic and current reports filed with the SEC.

167. The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Fidelity National not misleading.

168. The Individual Defendants, as directors and officers of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public

statements disseminated by Fidelity National.

169. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

170. By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## <u>COUNT III</u>

**Against the Individual Defendants for Breach of Fiduciary Duty**

171. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

172. The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

173. The Individual Defendants violated and breached their fiduciary

duties of care, loyalty, reasonable inquiry, and good faith.

174. The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures, and otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

175. As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

176. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in

defending itself in the Securities Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

177.   Plaintiff, on behalf of Fidelity National, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

178.   Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

179.   By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the *ultra vires* and illegal conduct complained of herein.

180.   Plaintiff, on behalf of Fidelity National, has no adequate remedy at law.

## COUNT V

**Against the Individual Defendants for Waste of Corporate Assets**

181.  Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

182.  The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

183.  As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and collecting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending against the Securities Action.

184.  As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

185.  Plaintiff, on behalf Fidelity National, has no adequate remedy at law.

## COUNT VI
**Against the Individual Defendants for
Unjust Enrichment**

186.  Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

187.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Fidelity National.

188.   The Individual Defendants were unjustly enriched by their receipt of bonuses, stock options, or similar compensation from Fidelity National that was tied to their performance or to the artificially inflated valuation of Fidelity National.

189.   Plaintiff, as a stockholder and representative of the Company, seeks restitution from the Individual Defendants, and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants as a result of their wrongful conduct and fiduciary breaches.

190.   As a direct and proximate result of the Individual Defendants' misconduct, the Company has suffered significant damages, as alleged herein.

191.   Plaintiff, on behalf of Fidelity National, has no adequate remedy at law.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.      Declaring that Plaintiff may maintain this derivative action on behalf of Fidelity National and that Plaintiff is a proper and adequate representative of the Company;

B.      Awarding the Company damages in an amount to be determined at trial as a result of the Individual Defendants' violation of securities law, breaches of fiduciary duties and waste of corporate assets;

C.      Directing Fidelity National to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Fidelity National and its shareholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;

- developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

- strengthening the Board's internal operational control functions;

D.      Awarding to Fidelity National restitution from the Individual Defendants;

E.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.     Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated:  October 22, 2024

> _/s/ William J. Cook_____
> William J. Cook, Esquire
> Florida Bar No. 986194
> Cook Law, P.A.
> 610 East Zack Street
> Suite 505
> Tampa, Florida 33602
> Telephone:  813/489-1001
> wcook@cooklawfla.com
>
> *Local Counsel for Plaintiff*
>
> **RIGRODSKY LAW, P.A.**
> Seth D. Rigrodsky
> Gina M. Serra
> Herbert Mondros
> Timothy J. MacFall
> 300 Delaware Avenue, Suite 210
> Wilmington, DE 19801
> (302) 295-5310

**GRABAR LAW OFFICES**
Joshua H. Grabar
One Liberty Place
1650 Market Street, Suite
3600
Philadelphia, PA 19103
Telephone: (267) 507-6085
Email: jgrabar@grabarlaw.com

*Attorneys for Plaintiff*